STACY MCCROSKEY,                          *

     Plaintiff,                        *

vs.                                       *

                                         CASE NO. 3:09-CV-71 (CDL)

UNITED PARCEL SERVICE, INC.,              *

     Defendant.                        *

_____

## O R D E R

     Plaintiff Stacy McCroskey ("McCroskey") alleges that Defendant ("UPS"), his former employer, failed to promote him and ultimately terminated him because of his insulin-treated diabetes. McCroskey contends that UPS's actions constitute discrimination and retaliation actionable under the Americans with Disabilities Act of 1990, 42 U.S.C. § 12101 *et seq.* ("ADA"). Presently pending before the Court is UPS's Motion for Summary Judgment (ECF No. 26). For the reasons set forth below, UPS's motion is granted.

### SUMMARY JUDGMENT STANDARD

     Summary judgment may be granted only "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). In determining whether a *genuine* dispute of *material* fact exists to defeat a motion for summary judgment, the evidence is viewed in the light most favorable to the party opposing summary judgment, drawing

all justifiable inferences in the opposing party's favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). A fact is *material* if it is relevant or necessary to the outcome of the suit. *Id.* at 248. A factual dispute is *genuine* if the evidence would allow a reasonable jury to return a verdict for the nonmoving party. *Id.*

## McCROSKEY'S "AFFIDAVIT"

Before the Court recounts the evidence viewed in the light most favorable to McCroskey, the Court must determine whether to consider McCroskey's "affidavit," which he submitted in opposition to summary judgment. Pl.'s Mem. of Law in Opp'n to Def.'s Mot. for Summ. J. [hereinafter Pl.'s MSJ Resp.] Attach. 3, Pl.'s Aff., ECF No. 38-3 [hereinafter Pl.'s Aff.]. As UPS noted in its objection to McCroskey's affidavit, the document purporting to be McCroskey's "affidavit" is not dated or notarized. *See generally* Notice of Objection to Pl.'s Aff., ECF No. 40. The document purporting to be McCroskey's affidavit also contains McCroskey's typed name rather than his signature. Pl.'s Aff. 10. McCroskey, who is represented by counsel, did not respond to UPS's objection.

Under 28 U.S.C. § 1746, a declaration made "under penalty of perjury, and dated" is admissible in lieu of a sworn affidavit on a motion for summary judgment. Therefore, although McCroskey's "affidavit" did not need to be notarized, it did need to "include a handwritten averment, signed and dated, that the statement is true

2

under the penalties of perjury." *Holloman v. Jacksonville Hous. Auth.*, No. 06-10108, 2007 WL 245555, at *2 (11th Cir. Jan. 30, 2007) (per curiam) (citing 28 U.S.C. § 1746). McCroskey's "affidavit" does not comply with these requirements because it does not contain McCroskey's signature and because it is not dated. Accordingly, the Court declines to consider McCroskey's "affidavit" in ruling on UPS's summary judgment motion.

## FACTUAL BACKGROUND

The evidence, viewed in the light most favorable to McCroskey, reveals the following. Unless otherwise noted, the evidence is undisputed. The Court observes that although McCroskey purports to dispute certain material facts, he has not pointed to sufficient evidence to demonstrate genuine disputes as to those facts. As required by the Court's local rules, UPS submitted a statement of material facts that contains citations to the record. *See* M.D. Ga. R. 56. The Court has reviewed those citations for accuracy. In his response to the statement of material facts, McCroskey denied some of UPS's proffered facts, but he pointed the Court to no evidence to demonstrate a material fact dispute. McCroskey's bare assertions, with no record support, are not sufficient to create a genuine fact dispute. *See* Fed. R. Civ. P. 56(e)(2) (effective until Dec. 1, 2010) (stating that party opposing summary judgment must "set out specific facts showing a genuine issue for trial); *accord* M.D. Ga. R. 56 ("All

3

material facts contained in the moving party's statement which are not specifically controverted by specific citation to the record shall be deemed to have been admitted, unless otherwise inappropriate."). Accordingly, the Court does not consider McCroskey's bare assertions in determining whether a fact is disputed.

## I. Overview of McCroskey's Employment with UPS

UPS delivers packages to and from customers throughout the world. McCroskey worked at UPS's package center in Carnesville, Georgia, from August 28, 1998 until June 2009. McCroskey worked primarily as a part-time preloader, and his job was to load packages onto UPS's package cars at the beginning of each day.

## II. McCroskey's DOT Card

In 2002, McCroskey expressed an interest in becoming a driver for UPS. In 2002, McCroskey obtained a medical examiner's certificate ("DOT card"), which is required by the U.S. Department of Transportation ("DOT") for drivers of commercial vehicles weighing more than 10,000 pounds. *See* 49 C.F.R. § 391.41(a) (requiring medical certification for operators of commercial motor vehicles). After McCroskey presented his DOT card to UPS, he performed part-time driving duties in addition to his preloader job. In April 2005, however, McCroskey's DOT card was not renewed because of McCroskey's insulin-treated diabetes mellitus. *See* 49 C.F.R. § 391.41(b)(3) ("A

4

person is physically qualified to drive a commercial motor vehicle if that person--[h]as no established medical history or clinical diagnosis of diabetes mellitus currently requiring insulin for control[.]"). As McCroskey acknowledges, after he lost his DOT card, he was not permitted to drive UPS vehicles weighing over 10,000 pounds. Def.'s Mot. for Summ. J. [hereinafter Def.'s MSJ] App. 1, Pl.'s Dep. 126:13-15, ECF No. 26-3 to -18 [hereinafter Pl.'s Dep.].

### III. McCroskey's Participation in the UPS Diabetes Protocol

After McCroskey lost his DOT card, UPS told him that he could drive UPS vehicles weighing less than 10,000 pounds pursuant to UPS's Diabetes Protocol ("Protocol"). Def.'s MSJ Attach. 2, Carvalho Decl. ¶ 12, ECF No. 26-19 [hereinafter Carvalho Decl.]. UPS created the Protocol to allow diabetic employees who can control their diabetes to drive vehicles weighing 10,000 pounds or less, while also addressing the DOT-identified safety risks posed by diabetic drivers. *Id.* ¶ 13. Under the Protocol, employees with insulin-treated diabetes mellitus are individually assessed to determine whether they can safely operate UPS vehicles weighing 10,000 pounds or less. Pl.'s MSJ Am. Resp. Attach. 2, Carvalho Dep., ECF No. 42-1 [hereinafter Carvalho Dep.] Ex. 2, Diabetes Protocol at D-0772, Sept. 7, 2006 [hereinafter Protocol]. The Protocol does not apply to non-driving positions. Carvalho Decl. ¶ 14. An employee who qualifies under the Protocol is permitted to drive vehicles weighing

5

10,000 pounds or less, provided that such vehicles are available in the package center, there are circumstances requiring the use of such vehicles, and the employee possesses the requisite seniority to be placed in that position. *Id.*

UPS's Georgia District occupational health manager, Cathy Carvalho, was responsible for overseeing McCroskey's participation in the Protocol. Carvalho Dep. 88:7-11; Carvalho Decl. ¶ 12; Protocol at D-0775. The Carnesville package center manager, Steve Williams, was responsible for cooperating with Carvalho with regard to the Protocol. Carvalho Dep. 88:12-15; Protocol at D-0775. McCroskey participated in the Protocol from approximately June 2005 through July 2008. Under the Protocol, McCroskey had to be evaluated by a physician once a quarter. Carvalho Decl. ¶ 16. To accomplish these evaluations, Carvalho provided the necessary medical forms to McCroskey via Williams, and McCroskey took the paperwork to his endocrinologist. *Id.* Once McCroskey's endocrinologist returned the paperwork to UPS, Carvalho reviewed the forms for completeness and forwarded them to an outside medical expert for a determination of whether McCroskey could safely operate UPS vehicles. *Id.* Carvalho communicated the medical expert's determination to McCroskey's manager. *Id.* ¶ 17. McCroskey's driving status was based on the medical expert's determination. *Id.* While Williams had the ultimate responsibility to assess whether his drivers were fit to drive, he

did not determine McCroskey's driving status under the Protocol; rather, the outside medical expert made that decision. Def.'s MSJ Attach. 4, Williams Decl. ¶ 16, ECF No. 26-21 [hereinafter Williams Decl.].

When McCroskey was approved to drive under the Protocol, he was offered driving opportunities and made deliveries in a vehicle that weighed under 10,000 pounds. There were, however, times when the medical expert did not approve McCroskey to drive, and there were times when the outside medical expert only approved McCroskey to drive on Saturdays, when McCroskey would not have any preloading duties. Carvalho Decl. ¶ 18; *see also* Carvalho Dep. 68:2-24 & Ex. 9 (noting that medical expert approved McCroskey to drive on Saturdays but did not want McCroskey to do both preloading and driving on the same day).

## IV. McCroskey's Federal Exemption

Under 49 U.S.C. §§ 31136(e) and 31315, the Secretary of Transportation may grant insulin-treated diabetics an exemption from the DOT card requirement. On approximately November 8, 2005, McCroskey became eligible to apply for the DOT exemption, which would permit him to drive all UPS vehicles, including those that weighed over 10,000 pounds, without participating in the Protocol. *See* Qualification of Drivers, 70 Fed. Reg. 67,777, 67,777 (Dep't of Transp. Nov. 8, 2005) (notice of revised final disposition). Carvalho

told McCroskey that he could apply for the DOT exemption, and she gave him a telephone number to call for more information. Carvalho Decl. ¶ 15. McCroskey contends that Carvalho never told him about the exemption. Pl.'s MSJ Resp. 18. The only evidence he cited in support of this contention does not actually support it. *See* Carvalho Dep. Ex. 7 (noting that outside medical expert felt that McCroskey would not qualify for the federal waiver because his diabetes was not adequately controlled); Carvalho Dep. Ex. 8 (noting that outside medical expert had not cleared McCroskey to drive).

McCroskey did receive a DOT exemption, effective October 15, 2007. Pl.'s Dep. Ex. D, Diabetes Mellitus Exemption, Oct. 15, 2007, ECF No. 26-6; *see also* Diabetes Exemption Applications, 72 Fed. Reg. 58,360, 58,362 (Dep't of Transp. Oct. 15, 2007) (notice of final disposition). McCroskey acknowledges that he did not tell Carvalho about the exemption or show her a copy of it until August 2008. Pl.'s Dep. 138:24-140:7. McCroskey did tell Williams about the exemption, although McCroskey did not show Williams a copy of it. *Id.* at 138:13-23. When Carvalho received a copy of McCroskey's DOT exemption, McCroskey was medically qualified to drive all UPS vehicles without participating in the Protocol, and UPS gave McCroskey the paperwork he needed to complete to become eligible for a full-time driver position.

## V.    Cover Driving Position

It is undisputed that McCroskey wanted to attend UPS cover driving school so that he could become a part-time cover driver—covering the routes of absent full-time UPS package car drivers—and ultimately a full-time UPS package car driver.  To be qualified to attend cover driving school and to become a full-time UPS driver, a UPS employee must possess a valid DOT card or DOT exemption because cover drivers and full-time drivers must be able to drive DOT-regulated trucks.[1]  Def.'s MSJ Attach. 3, Brewington Decl. ¶ 4, ECF No. 26-20.  The employee must present UPS with documentation of the DOT card or DOT exemption to be considered for cover driving school; UPS cannot rely on the employee's word that he received a DOT exemption.  *Id.*

---

[1]McCroskey contends that he did work as a cover driver without a DOT card.  Pl.'s Resp. to Def.'s Statement of Material Facts ¶ 34, ECF No. 30. The evidence he cited in support of this statement does not support the contention.  First, he cited a portion of his deposition, in which McCroskey discusses his participation in various leisure activities.  Pl.'s Dep. 34:1-25.  Second, he cited exhibits 13-19 to Williams's declaration. Exhibit 13 appears to be a spreadsheet with the handwritten title "Drivers."  Pl.'s MSJ Resp. Attach. 3, Williams Dep., ECF 38-8 to -9 [hereinafter Williams Dep.] Ex. 13, ECF No. 38-9.  The headers of the spreadsheet are not entirely clear, and the document does not appear to state what type of truck McCroskey was assigned to drive.  *Id.*  Exhibit 14 appears to be an untitled spreadsheet with largely illegible headers. Williams Dep. Ex. 14.  Even if Exhibit 14 does establish that McCroskey drove a UPS truck, it does not appear to establish what kind.  Exhibits 15 to 18 appear to be employee earnings statements, which are difficult to read and do not establish what kind of UPS truck, if any, McCroskey drove. Williams Dep. Exs. 15-18.  Exhibit 19 appears to be UPS package labels. Williams Dep. Ex. 19.  Nothing in the documents or the testimony regarding the documents establishes that McCroskey worked as a cover driver without a DOT card.

Whenever the Carnesville package center determines that it needs another cover driver, UPS Human Resources Representative Sophia Brewington selects a Carnesville package center employee to attend cover driving school. *Id.* ¶ 5. In general, Brewington selects the most senior employee who applies to go to cover driving school, provided that the employee meets all of the requirements, including the DOT certification requirement. *Id.*

In June 2006, Brewington selected Jayson Garner to attend cover driving school. *Id.* ¶ 7. Brewington did not select McCroskey because he did not have a DOT card or DOT exemption on file with UPS. *Id.* In May 2007, Brewington selected Paul Bragg and Don Ivester to attend cover driving school. *Id.* ¶ 8. Brewington did not select McCroskey because he did not have a DOT card or DOT exemption on file with UPS. *Id.* In March 2008, Brewington selected Kenneth Dutton and Curtis Ginn to attend cover driving school because they were the "most senior, qualified employees." *Id.* ¶ 9. She did not select McCroskey because he did not have a DOT card or DOT exemption on file with UPS. *Id.* ¶ 14. There have been no openings for cover driving school at the Carnesville package center since March 2008. *Id.* ¶ 10.

When a full-time driving position is available in the Carnesville package center, Brewington decides which employee will be awarded the position. *Id.* ¶ 11. A full-time driver position came open in Carnesville in January 2008, and Brewington selected Jayson

Garner.  *Id.*  ¶ 12.  Brewington did not select McCroskey because he did not have a DOT card or DOT exemption on file with UPS.  *Id.* ¶ 14. No full-time driving positions have come available in Carnesville since January 2008.  *Id.* ¶ 13.

## VI.  McCroskey's Disciplinary Record and Termination

McCroskey admits that UPS took the following disciplinary actions against him.  In August 2000, UPS gave McCroskey a written warning letter for using foul and abusive language toward a supervisor.  In March 2003, UPS gave McCroskey an intent-to-suspend notice for using abusive language toward a supervisor.  In August 2005, UPS gave McCroskey a warning letter for insubordination and for using abusive language toward a supervisor.  In February 2006, UPS counseled McCroskey about misconduct and about a lack of respect toward a supervisor. McCroskey also asserts that UPS suspended him for a week in June 2006 for sitting down to check his blood sugar. Pl.'s Dep. 81:24-85:20.  McCroskey further contends that UPS intended to terminate him later in 2006, although the termination was never implemented because Williams stopped it.  Pl.'s MSJ Resp. 4; Pl.'s Dep. 81:2-12.

In September 2006, UPS discharged McCroskey for walking off the job, but McCroskey was reinstated after he grieved his discharge through the union and agreed to attend anger management classes.  In January 2009, UPS terminated McCroskey for insubordination and

failure to follow instructions; he was reinstated with a final warning after he filed a grievance and agreed to apologize for his behavior. In February 2009, Williams sent McCroskey home because of insubordination.

Finally, on June 16, 2009, McCroskey and Williams got into a heated dispute about driving assignments because Williams asked someone other than McCroskey to take a driving assignment. McCroskey admits that he called Williams a liar and that both McCroskey and Williams were "pretty charged." Pl.'s Dep. 101:15-105:5. For Williams, the altercation was the "final straw," and Williams terminated McCroskey's employment for insubordination. Williams Decl. ¶¶ 33-36. In making the decision to terminate McCroskey, Williams considered the other instances of insubordination, abusive language, and failure to follow instructions. *See id.* ¶ 35. McCroskey filed a grievance regarding his termination, and the termination was upheld.

## VII. McCroskey's Diabetes

Although McCroskey has insulin-treated diabetes, he is not on a special diet; he eats a variety of foods, including chocolate Pop-Tarts and fast food. Pl.'s Dep. 32:23-33:18. McCroskey does have to monitor his food intake and plan his meals. *Id.* at 240:3-13. McCroskey leads an active lifestyle, which includes hunting, fishing, and riding motorcycles and ATVs. *Id.* at 33:22-34:18. McCroskey

believes that he is physically capable of being a full-time package driver for UPS, delivering and picking up packages for eight hours a day, five days a week.  *Id.* at 217:16-24.

**VIII.    McCroskey's Claims**

McCroskey asserts that UPS discriminated against him because of a disability when UPS:

(1)  Did not permit McCroskey to drive any vehicles after he lost his DOT card in April 2005 and before he presented evidence of his DOT exemption in August 2008 unless he participated in the Protocol.  2d Am. Compl. ¶¶ 11, 28, ECF No. 20.

(2)  Did not permit McCroskey to drive vehicles weighing over 10,000 pounds while McCroskey participated in the Protocol after April 2005 and before August 2008.  2d Am. Compl. ¶ 18.

(3)  Denied McCroskey advancement opportunities while he participated in the Protocol after April 2005 and before August 2008.  *Id.* ¶ 12.  For example, UPS sent Jayson Garner to cover driving school in June 2006.  *Id.* ¶ 15.  In January 2008, UPS promoted Jayson Garner to a full-time driver position instead of McCroskey. *Id.* ¶ 21.

(4)  Restricted McCroskey's driving duties and/or failed to approve McCroskey for driving duties while he participated in the Protocol after April 2005 and before August 2008.  *Id.* ¶ 13.

(5)   Suspended or terminated McCroskey for checking his blood sugar in June 2006.  *Id.* ¶¶ 14-15.

(6)   Threatened to terminate McCroskey in summer 2006.  *Id.* ¶ 16.

(7)   Denied McCroskey a full-time driving position when it came open in January 2008.  *Id.* ¶¶ 20-21, 23.

McCroskey also claims that UPS took these actions in retaliation for his complaints of disability discrimination.  *Id.* ¶ 30.  Finally, he contends that UPS terminated him in retaliation for complaining about disability discrimination.  *Id.*

## IX.  McCroskey's Charges of Discrimination

McCroskey filed two charges of discrimination with the U.S. Equal Employment Opportunity Commission ("EEOC").  First, he filed a charge of discrimination that the EEOC received on February 14, 2007, in which he alleged that he "applied for the Cover Driver's position on June 19, 2006, and was not selected."  Pl.'s Dep. Ex. 35, Charge of Discrimination, Feb. 14, 2007, ECF No. 26-12 at 22 [hereinafter Pl.'s 1st EEOC Charge].  McCroskey further alleged that he "was not afforded a reasonable accommodation for the" cover driver position. *Id.*  McCroskey initially completed an EEOC Charge Questionnaire regarding this issue in August 2006, alleging that he had been bypassed for a promotion because of his diabetes.  Pl.'s Dep. Ex. 33, EEOC Charge Questionnaire, Aug. 17, 2006, ECF No. 26-12 at 17-20 [hereinafter 2006 EEOC Questionnaire].  McCroskey asserts that he did

14

not file the charge of discrimination sooner because of a series of mistakes and miscommunications by EEOC personnel. Pl.'s MSJ Resp. 9-11.

McCroskey filed a second charge of discrimination with the EEOC on October 9, 2009. Pl.'s Dep. Ex. 55, Charge of Discrimination, Oct. 9, 2009, ECF No. 26-18 at 6 [hereinafter Pl.'s 2d EEOC Charge]. In that charge, McCroskey alleged that UPS fired him in retaliation for filing his first EEOC charge. *Id.*

After McCroskey received a right-to-sue letter from the EEOC on February 20, 2009, McCroskey filed his original Complaint in this Court on May 21, 2009. *See generally* Compl., ECF No. 1.

## DISCUSSION

## I.  McCroskey's Discrimination Claims

UPS contends that McCroskey's discrimination claims are barred because McCroskey either failed to assert them in a charge of discrimination with the EEOC or because McCroskey's EEOC charge regarding the discrimination claims was not timely. The Court need not reach this question because McCroskey failed to establish that UPS discriminated against him because of a disability.

### A.  Applicable Law

All of McCroskey's discrimination claims are based on actions UPS took in 2008 or earlier. McCroskey's discrimination claims are that UPS passed him over for cover driving school in 2006, 2007, and

15

2008, and that UPS passed him over for a full-time driving position in 2008. It is undisputed that there have been no openings for cover driving school at the Carnesville package center since March 2008. It is also undisputed that no full-time driving positions were available in Carnesville since January 2008. Though McCroskey generally alleges that he was not given driving opportunities at any time after getting his DOT exemption in October 2007, McCroskey does not allege any specific discriminatory adverse action by UPS during 2009, such as passing McCroskey over for a spot in cover driving school or for a full-time driving position.

Because all of McCroskey's discrimination claims are based on UPS actions that occurred prior to January 1, 2009, the Court analyzes his claims under the ADA as it existed prior to January 1, 2009. Thus, although Congress broadened certain provisions of the ADA, effective January 1, 2009, *see* ADA Amendments Act of 2008, Pub. L. No. 110-325 § 8, 122 Stat. 3553, 3559 (2008), those amendments do not apply here because Congress did not express an intent for the changes to apply retroactively, *e.g., Kania v. Potter*, 358 F. App'x 338, 341 n.5 (3d Cir. 2009) (collecting cases); *Fikes v. Wal-Mart, Inc.*, 322 F. App'x 882, 883 n.1 (11th Cir. 2009) (per curiam) (applying pre-2009 ADA because there was no expression of congressional intent for the amendments to apply retroactively).

Accordingly, the Court looks to the ADA as it existed at the time of the alleged discrimination.

## B. Elements of McCroskey's Disability Discrimination Claims

To prevail on his ADA discrimination claims, McCroskey must establish that (1) he had a disability, (2) he was qualified to perform the job he sought, (3) he was subjected to an adverse employment action, such as a denial of a promotion, and (4) his disability was a substantial or motivating factor that prompted UPS to take the adverse employment action. *Collado v. United Parcel Serv. Co.*, 419 F.3d 1143, 1152 n.5 (11th Cir. 2005). Thus, if McCroskey has no "disability" as that term is defined by the ADA, then he has no valid ADA discrimination claim.

The pre-2009 ADA defined "disability" as "(A) a physical or mental impairment that substantially limits one or more of the major life activities of such individual; (B) a record of such an impairment; or (C) being regarded as having such an impairment." 42 U.S.C. § 12102 (2008).

It is undisputed that McCroskey suffers from insulin-treated diabetes, and that insulin-treated diabetes is a physical impairment under the ADA. 45 C.F.R. pt. 84 App. A, subpart (A)(3) (defining diabetes as an impairment); *accord Collado*, 419 F.3d at 1155. The next question is whether McCroskey's insulin-treated diabetes substantially limits one or more of his major life activities.

17

McCroskey contends that his diabetes substantially limits his ability to care for himself. Pl.'s MSJ Resp. 15. First, McCroskey "cannot eat what he wants when he wants as much as he wants." *Id.* Second, though "he can do lots of activities, . . . he is limited" because he has to plan for physical activities by adjusting his insulin and food intake. *Id.* Third, when he is physically active, McCroskey must take breaks to monitor his blood sugar and adjust accordingly. *Id.*

Under the pre-2009 ADA, these limitations are not enough to establish that McCroskey is substantially limited in his ability to care for himself or in any other major life activity. As the Eleventh Circuit Court of Appeals pointed out in *Collado*, "[m]any people have to monitor their food intake for health and lifestyle reasons," and having to watch calories and carbohydrates does not significantly restrict a person's ability to care for himself. *Collado*, 419 F.3d at 1156. Furthermore, McCroskey is not substantially limited in a major life activity simply because he must regulate his blood sugar level using insulin; under the pre-2009 ADA, "the question of whether a plaintiff is substantially impaired for disability purposes is to be considered in light of available mitigation measures such as taking insulin." *Id.* Finally, the present record does not demonstrate that McCroskey's diabetes limits him at all in caring for himself or in any other major life activity. As discussed above, McCroskey is able to eat a variety of foods as

long as he monitors his food intake, and he leads an active lifestyle, which includes hunting, fishing, and riding motorcycles and ATVs. Pl.'s Dep. 33:22-34:18. McCroskey also believes that he is physically capable of being a full-time package driver for UPS, delivering and picking up packages for eight hours a day, five days a week. *Id.* at 217:16-24. For all of these reasons, the Court concludes that McCroskey failed to present evidence sufficient to demonstrate that he has a "disability" within the meaning of 42 U.S.C. § 12102(2)(A) as it existed prior to January 1, 2009.

McCroskey also failed to present evidence or argument that he has a record of a substantially limiting impairment. To show a "record" of impairment within the meaning of 42 U.S.C. § 12102(2)(B), McCroskey must establish that his diabetes "in the past substantially limited him in at least one major life activity." *Collado*, 419 F.3d at 1157. There is no evidence in the present record that McCroskey's diabetes has ever substantially limited him in any major life activity.

Finally, McCroskey did not establish that UPS regarded him as having an impairment that substantially limits a major life activity, which is necessary to establish a "disability" under 42 U.S.C. § 12102(2)(C) as it existed prior to January 1, 2009. McCroskey argues that UPS's refusal to let McCroskey drive DOT-regulated trucks due to his diabetes establishes that UPS regarded

him as being substantially limited in a major life activity. *See* Pl.'s MSJ Resp. 16 (arguing that "UPS's adoption of [the] DOT regulation [prohibiting diabetics from driving commercial vehicles] is clear and unequivocal [evidence] that UPS perceives all diabetic drivers as safety threats"). McCroskey also argues that UPS regarded McCroskey as being substantially limited in a major life activity because UPS refused to let McCroskey drive unless he obtained a DOT exemption or was approved under the Protocol. *Id.*

The record does show that UPS regarded McCroskey as unable to fill the positions of cover driver and full-time truck driver. It also shows that, at times, UPS regarded McCroskey as unable to fill the position of part-time unregulated truck driver. There is no evidence that UPS regarded McCroskey as substantially impaired in driving in general, but even if such evidence existed, driving is not a major life activity for purposes of the ADA. *Collado*, 419 F.3d at 1157-58. Furthermore, the fact that UPS regarded McCroskey as substantially impaired in driving a truck does not mean that UPS regarded him as substantially limited in a major life activity, such as working. "Being regarded as unable to perform only a particular job . . . is insufficient, as a matter of law, to prove that [McCroskey] is regarded as substantially limited in the major life activity of working." *Id.* at 1157 (internal quotation marks omitted). Instead, McCroskey must prove that UPS considered him

"'significantly restricted in the ability to perform either a class of jobs or a broad range of jobs in various classes.'" *Id.* (quoting 29 C.F.R. § 1630.2(j)(3)(I)). "The inability to perform a single, particular job does not constitute a substantial limitation in the major life activity of working." 29 C.F.R. § 1630.2(j)(3)(I). Rather, an impairment must be regarded as precluding "an individual from more than one type of job, even if the job foreclosed is the individual's job of choice." *Collado*, 419 F.3d at 1157 (internal quotation marks omitted).

There is no evidence in the present record that UPS regarded McCroskey as substantially limited in the ability to perform any job other than driver. At the time of the alleged discrimination, McCroskey worked as a preloader and, at times, drove an unregulated truck.[2] McCroskey nonetheless argues that UPS precluded him from a broad range of jobs because UPS's outside medical expert once recommended that McCroskey be permitted to drive only on Saturdays, when he did not also have preloading duties. Pl.'s MSJ Resp. 17. McCroskey appears to interpret UPS's outside medical expert's recommendation as precluding him from performing preloading duties

_____

[2]McCroskey asserts that, after he was disqualified from driving under the Protocol, Williams asked him to take a medical leave until he was able to requalify to drive under the Protocol. Pl.'s MSJ Resp. 6; Pl.'s Statement of Material Facts ¶ 27, ECF No. 31. The only evidence he cited in support of this assertion does not support it. *See* Pl.'s Dep. 151:1-152:25 (discussing McCroskey's father and McCroskey's psychotherapy treatment via UPS's employee assistance program).

and "any other jobs that included heavier work than driver." *Id.* Again, however, the undisputed evidence establishes that the Protocol did not apply to non-driving positions, and UPS's outside medical expert's focus was on determining whether McCroskey was safe to drive a UPS truck. There is no evidence in the present record that McCroskey was precluded from doing other jobs, such as his preloader job. Therefore, the Court concludes that McCroskey has failed to demonstrate a genuine fact dispute on the issue of whether UPS regarded him as substantially limited in any major life activity, including the major life activity of working.

For all of these reasons, the Court finds that McCroskey failed to provide sufficient evidence for a reasonable jury to conclude that he suffered from a "disability" as defined by the pre-2009 ADA. UPS is therefore entitled to summary judgment on McCroskey's disability discrimination claims.

## II. McCroskey's Retaliation Claims

In addition to his disability discrimination claims, McCroskey alleges that UPS retaliated against him for complaining of disability discrimination. Specifically, McCroskey alleges that UPS retaliated against him for filing his first EEOC Charge, and for complaining to UPS of disability discrimination, by denying him the opportunity to drive a UPS truck. 2d Am. Compl. ¶ 30. McCroskey also contends that

UPS fired him on June 16, 2009 in retaliation for filing his first EEOC charge on February 12, 2007. *Id.*; Pl.'s 2d EEOC Charge.

A. Retaliation Basics

Where, as here, a plaintiff presents no direct evidence of retaliatory intent, the plaintiff may proceed under the burden-shifting framework established in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *E.g.*, *Crawford v. Carroll*, 529 F.3d 961, 975-76 (11th Cir. 2008); *see also Stewart v. Happy Herman's Cheshire Bridge, Inc.*, 117 F.3d 1278, 1287 (11th Cir. 1997) (noting that ADA retaliation claims are assessed under the same framework as Title VII retaliation claims). Under this framework, the plaintiff must establish a prima facie case of retaliation by showing that "(1) he engaged in a statutorily protected activity; (2) he suffered an adverse employment action; and (3) he established a causal link between the protected activity and the adverse action." *E.g.*, *Brown v. Ala. Dep't of Transp.*, 597 F.3d 1160, 1181 (11th Cir. 2010) (internal quotation marks omitted). If the plaintiff establishes a prima facie case of retaliation, then the burden shifts to the employer to articulate a legitimate non-retaliatory reason for the challenged employment action. *Id.* "If the employer offers such legitimate reasons for the employment action, the plaintiff must then demonstrate that the employer's proffered explanation is a pretext

23

for retaliation." *Crawford*, 529 F.3d at 976 (internal quotation marks omitted).

## B. Pre-Termination Employment Actions

Curiously, UPS did not specifically address McCroskey's retaliation claims arising from its pre-termination employment actions. UPS did present arguments regarding those employment actions in its opposition to McCroskey's discrimination claims, and several of those arguments are equally applicable to McCroskey's retaliation claims. Specifically, UPS argued that several of McCroskey's claims are barred because McCroskey failed to exhaust his administrative remedies by filing a timely EEOC Charge regarding them. Def.'s Mem. in Supp. of Mot. for Summ. J. 8-10, ECF No. 26-1. UPS also argued that even if McCroskey established a prima facie case of discrimination with regard to certain of his claims, UPS presented a legitimate, nondiscriminatory reason for the employment actions and McCroskey presented no evidence of pretext. *Id.* at 17-18 & nn. 9-10. McCroskey received adequate notice of these arguments. He was afforded an opportunity to argue that his first EEOC Charge was timely filed and that his pre-termination claims were sufficiently related to the claims raised in that EEOC Charge. McCroskey was also given an opportunity to argue that UPS's proffered reasons for the employment actions were pretextual. Because these legal issues and the related evidentiary records have been fully developed, the Court

24

finds it appropriate to make a summary judgment ruling as to McCroskey's retaliation claims arising from the pre-termination employment actions. *See Morningstar Healthcare, LLC v. Greystone & Co.*, 294 F. App'x 542, 544 (11th Cir. 2008) (per curiam) (noting that summary judgment is appropriate even without formal notice where legal issues have been fully developed and the evidentiary record is complete).

The Court must first determine which of McCroskey's pre-termination retaliation claims are properly before the Court. Filing a timely charge of discrimination with the EEOC is a condition precedent to bringing a legal action in federal court pursuant to the ADA. 42 U.S.C. § 2000e-5(e)(1) (stating that Title VII charge of discrimination must be filed within 180 days after the alleged unlawful employment practice); 42 U.S.C. § 12117(a) (applying remedies and procedures of Title VII, including 42 U.S.C. § 2000e-5, to ADA); *accord Anderson v. Embarq/Sprint*, 379 F. App'x 924, 926 (11th Cir. 2010) (per curiam). Moreover, a "plaintiff's judicial complaint is limited by the scope of the EEOC investigation which can reasonably be expected to grow out of the charge of discrimination." *Gregory v. Ga. Dep't of Human Res.*, 355 F.3d 1277, 1280 (11th Cir. 2004) (per curiam) (internal quotation marks omitted). In general, "judicial claims are allowed if they amplify, clarify, or more clearly focus the allegations in the EEOC complaint, but

. . . allegations of new acts of discrimination are inappropriate."
*Id.* at 1279-80 (internal quotation marks omitted).  The Court assumes
for summary judgment purposes only that McCroskey's February 2007
EEOC Charge relates back to his August 2006 Charge Questionnaire.

In his original EEOC Charge, McCroskey only checked the box for
discrimination based on "disability," and he did not check the
"retaliation" box.  Pl.'s 1st EEOC Charge.  In that EEOC Charge,
McCroskey asserted that he was denied a cover driver position and not
afforded a reasonable accommodation for the position.  McCroskey did
not allege that UPS failed to award him the cover driver position in
retaliation for his complaints of disability discrimination, though
he did make such an allegation in his Complaint.  If this claim "can
reasonably be expected to grow out of the charge of discrimination,"
*Gregory*, 355 F.3d at 1280 (internal quotation marks omitted), then it
would be within the scope of the EEOC investigation.  In *Gregory*, for
example, the Eleventh Circuit concluded that the plaintiff's failure
to mark the "retaliation" box on her EEOC Charge was not fatal to her
retaliation claims because an "EEOC investigation of her race and sex
discrimination complaints leading to her termination would have
reasonably uncovered any evidence of retaliation."  *Id.*  Similarly,
McCroskey's claim that UPS denied him a cover driving position in
retaliation for his complaints of disability discrimination is
properly before the Court.

Likewise, McCroskey's claims for alleged retaliatory acts that occurred after he filed his first EEOC charge—the denial of an opportunity to attend cover driving school in May 2007 and March 2008, as well as the denial of a full-time driver position in January 2008—are properly before the Court because McCroskey contends that these adverse actions were caused by his first EEOC charge. *See, e.g., Thomas v. Miami Dade Pub. Health Trust*, 369 F. App'x 19, 23 (11th Cir. 2010) (per curiam) (internal quotation marks omitted).

Any retaliation claims that occurred prior to the date of McCroskey's first EEOC charge—other than the cover driving position discussed above—were not exhausted. Therefore, they cannot be considered by the Court. *Id.*

In summary, the only pre-termination retaliation claims that are properly before the Court are based on (1) the June 2006 denial of a cover driving opportunity, (2) the May 2007 denial of a cover driving opportunity, (3) the March 2008 denial of a cover driving opportunity, and (4) the January 2008 denial of a full-time driver job. Collectively, the Court refers to these claims as the promotion denial claims.

Turning to the merits of McCroskey's promotion denial claims, the Court finds that they all fail. Even if McCroskey had presented sufficient evidence to establish a causal connection between any statutorily protected activity and the promotion denials, he has not

established that UPS's proffered reason for the promotion denials was a pretext for unlawful retaliation. UPS contends that it did not promote McCroskey because he was not qualified for the cover driving position or the full-time driver position since he did not have a DOT card or DOT exemption on file with UPS when the promotion decisions were made. Brewington Decl. ¶ 7 (stating that Brewington did not select McCroskey to attend cover driving school in June 2006 because he did not have a DOT card or DOT exemption on file with UPS); *id.* ¶ 8 (stating that Brewington did not select McCroskey to attend cover driving school in May 2007 because he did not have a DOT card or DOT exemption on file with UPS);; *id.* ¶ 14 (stating that Brewington did not select McCroskey for the full-time driver position in January 2008 or the cover driving school opening in March 2008 because he did not have a DOT card or DOT exemption on file with UPS).

It is undisputed that it is a violation of DOT regulations to permit a person to drive DOT-regulated trucks without a DOT card or DOT exemption. It is also undisputed that a UPS employee had to have a DOT card or DOT exemption on file with UPS in order to be qualified for a cover driving school position or a full-time driving position, given that cover drivers and full-time drivers must be able to drive DOT-regulated trucks. McCroskey cannot seriously contend that such a requirement is pretext for discrimination or retaliation. Acceptance of Plaintiff's argument would be tantamount to condoning

the ridiculous proposition that UPS should have put McCroskey on the road in a DOT-regulated truck in direct violation of DOT regulations. *Cf.* 29 C.F.R. § 1630.15(e) (providing legal defense to disability discrimination claims if "challenged action is required or necessitated by another Federal law or regulation").

McCroskey contends that he was qualified for the cover driver position and the full-time driver position because McCroskey was "DOT-eligible" on November 8, 2005, when the DOT announced that insulin-treated diabetics could apply for a DOT exemption. The fact that McCroskey was eligible to apply for an exemption does not, however, establish that McCroskey was eligible to drive a DOT-regulated truck. Rather, McCroskey was not cleared to drive DOT-regulated trucks until he actually obtained a DOT exemption in October 2007. Moreover, McCroskey has not pointed to any evidence that UPS prevented him from applying for the DOT exemption; rather, the present record reflects that Carvalho told McCroskey that he could apply for the exemption. For all of these reasons, the Court finds that McCroskey has not presented sufficient evidence from which a reasonable factfinder could conclude that UPS's proffered reason for the June 2006 and May 2007 promotion denials was pretext for retaliation. UPS is therefore entitled to summary judgment on these claims.

The January and March 2008 promotion retaliation claims also fail. McCroskey actually was DOT-eligible as of October 2007. It is undisputed, however, that he did not give anyone at UPS a copy of his DOT exemption until August 2008. It is also undisputed that Brewington, the person responsible for making the promotion decisions in January and March 2008, did not know that McCroskey had a DOT exemption when she made the promotion decisions. Rather, Brewington held the honest impression that McCroskey was not qualified to be a cover driver or full-time driver because he had no DOT card or DOT exemption on file with UPS. *See* Brewington Decl. ¶¶ 14. Even though Brewington was mistaken about McCroskey's DOT eligibility, that mistake does not establish that her failure to promote McCroskey was retaliatory. *See Brooks v. Cnty. Comm'n of Jefferson Cnty.*, Ala., 446 F.3d 1160, 1163 (11th Cir. 2006) ("A plaintiff must show not merely that the defendant's employment decisions were mistaken but that they were in fact motivated by [an impermissible reason]." (internal quotation marks omitted)); *cf. Damon v. Fleming Supermarkets of Fla., Inc.*, 196 F.3d 1354, 1363 n.3 (11th Cir. 1999) ("An employer who fires an employee under the mistaken but honest impression that the employee violated a work rule is not liable for discriminatory conduct."). For all of these reasons, the Court finds that McCroskey has not presented sufficient evidence to show that UPS's proffered reason for the January and March 2008 promotion

denials was pretext for retaliation.  UPS is therefore entitled to summary judgment on these claims.

### C.   McCroskey's Termination

McCroskey also alleges that he was terminated in retaliation for filing his February 2007 EEOC Charge.  UPS does not dispute that McCroskey's EEOC Charge is statutorily protected activity and that his termination is a materially adverse action.  McCroskey has not, however, established a causal connection between the two events.  Though the "burden of causation can be met by showing close temporal proximity between the statutorily protected activity and the adverse employment action," "mere temporal proximity, without more, must be very close."  *Thomas v. Cooper Lighting, Inc.*, 506 F.3d 1361, 1364 (11th Cir. 2007) (internal quotation marks omitted).  "A three to four month disparity between the statutorily protected expression and the adverse employment action is not enough."  *Id.*  Here, the two-year gap between the 2007 EEOC Charge and McCroskey's termination does not establish a causal connection between the two events.

McCroskey argues that there is a causal connection because of the very close temporal proximity between the filing of his Compliant on May 21, 2009 and his termination on June 16, 2009.  Pl.'s MSJ Resp. 20.  Williams fired McCroskey within a month after McCroskey filed his Complaint in this Court.  UPS argues that Williams did not know about the Complaint when he fired McCroskey.  In support of this

argument, UPS relies exclusively on McCroskey's failure to present direct evidence that Williams knew, when he terminated McCroskey, that McCroskey had filed his Complaint. Likewise, UPS pointed to no direct evidence that Williams did not know about the Complaint when he fired McCroskey. The Court finds that it may reasonably infer that Williams knew about the Complaint when he made the termination decision. The Complaint was served on UPS on May 21, 2009. Proof of Service, ECF No. 3. UPS answered the Complaint on June 10, 2009—less than a week before Williams fired McCroskey. Answer, ECF No. 4. From this, the Court is satisfied that a genuine fact dispute exists as to whether Williams knew about the Complaint when he fired McCroskey. Accordingly, the Court concludes that McCroskey has established a prima facie case of retaliation with regard to his termination.

McCroskey has not, however, submitted sufficient evidence to establish that UPS's proffered reason for his termination—insubordination and a lengthy history of inappropriate conduct—was pretext for retaliation. McCroskey may demonstrate that UPS's proffered reason is pretextual by revealing "such weaknesses, implausibilities, inconsistencies, incoherencies or contradictions in [UPS's] proffered legitimate reasons for its actions that a reasonable factfinder could find them unworthy of credence." *Springer v. Convergys Customer Mgmt. Group Inc.*, 509 F.3d 1344, 1348

(11th Cir. 2007) (internal quotation marks omitted). A reason is not pretextual "unless it is shown both that the reason was false, and that [retaliation] was the real reason." *Id.* at 1349 (internal quotation marks omitted).

McCroskey admits that, prior to 2009, he received several warnings and suspensions due to abusive language toward supervisors. He also admits that he was terminated from his job in 2006 after walking off the job, though he was later reinstated. McCroskey further admits that UPS terminated McCroskey in January 2009 for insubordination and failing to follow instructions and that, though he was reinstated, it was with a final warning. These disciplinary actions form the backdrop of McCroskey's final termination, and McCroskey has not pointed to any evidence that his conduct did not merit the discipline. In other words, there is no evidence that UPS simply papered McCroskey's personnel file with charges of insubordination; McCroskey pointed to no evidence that he was *not* insubordinate, that he did *not* use abusive language, or that he did *not* demonstrate a lack of respect toward his supervisors.

McCroskey also did not point to any evidence that he was not insubordinate on June 16, 2009. Rather, he admits that he got into a heated dispute with Williams that day and that he called Williams a liar. For all of these reasons, the Court concludes that McCroskey did not meet his burden of demonstrating a genuine fact dispute on

the question of pretext.  Accordingly, UPS is entitled to summary judgment on his retaliatory termination claim.

CONCLUSION

For the reasons set forth above, UPS's Motion for Summary Judgment (ECF No. 26) is granted.


IT IS SO ORDERED, this 22nd day of December, 2010.


S/Clay D. Land
CLAY D. LAND
UNITED STATES DISTRICT JUDGE